IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| CRYSTAL WINGATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action File No. CV 1:12-165-JRH |
| | ) | |
| BC INVESTMENTS - AUGUSTA, LLC, WAL-MART STORES, INC., WAL-MART STORES EAST, INC., WAL-MART STORES EAST, L.P., XYZ CORP. 1, XYZ CORP. 2 and XYZ CORP. 3, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

NOW COMES, CRYSTAL WINGATE, Plaintiff herein and responds to Defendants' Motion for Summary Judgement as follows:

## I STATEMENT OF FACTS

Plaintiff Crystal Wingate ("Wingate") has brought this lawsuit against Defendants for personal injuries sustained by her on December 12, 2010 when she slipped on some water on the floor and fell as she was walking down an aisle in a Wal-Mart store located at 3209 Deans Bridge Road, Augusta, Georgia 30906.

Ms. Wingate had gone to the subject Wal-Mart store that day to shop for Christmas gifts and was walking down an aisle in the seasonal goods section of the store, which took up approximately 4 aisles of the store. While shopping, Ms. Wingate saw some cookie baskets on the shelves in the middle of one of the aisles approximately 5 feet from where she later fell. She then kept shopping

and walking with her cart down the various aisles of the seasonal goods department. (Crystal Wingate Dep. p. 105, 108 - 110 and 117). Ms. Wingate then doubled back to get one of the cookie baskets and proceeded with her cart back down the aisle with cookie baskets, but this time coming the opposite direction from which she had previously walked down that aisle. (Wingate Dep. p. 108:3-11, 117:20-21 and 119:10-13).

As Ms. Wingate was pushing her cart towards where the cookie baskets were on the shelves she then suddenly slipped on what appeared to be "maybe a cup or two" of water, next to the shelves and approximately five feet from where the cookie baskets were located. (Wingate Dep. p. 117:9-21, 120:17-22 and 129:1-16, 130:1-10 and 131:10-14; Frederick Mansell Dep. p. 38:24 - 39:14).

Although Ms. Wingate had earlier that day walked with her cart down the aisle where she fell, she had at that time come from the opposite direction in which she was pushing her cart when she fell, and had not noticed any water or other substance on the floor, either during that previous trip or on her return to retrieve a cookie basket. (Wingate Dep. p. 119:10 - 120:1 and 128:25 - 129:25).

As Ms. Wingate was still on floor several Wal-Mart employees came up to her to offer her assistance. She then heard someone state words to the effect "That the roof was leaking, and this should have been cleaned up already". (Wingate Dep. p. 134:23 - 135:1). Although Ms. Wingate could not identify who made that statement, Jessica Goff, a friend who had accompanied her to the store, testified that it was a male Wal-Mart employee wearing a Wal-Mart uniform who had come to Ms. Wingate's assistance who had made such statement. (Goff Dep. p. 46:10 - 48:10).

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. There Exist Material Issues of Fact Which Preclude the Grant of Summary

**Judgment as to Defendant Wal-Mart Stores East, L.P.**

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The Georgia Supreme Court, in American Multi-Cinema, Inc. v. Brown, 285 Ga. 442 (2009) stated:

> We concluded Robinson with the following admonition:
>
> In sum, we remind members of the judiciary that the "routine" issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the

> plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication, and that summary judgment is granted only when the evidence is plain, palpable, and undisputed.
>
> To put it in more concrete terms, this means that issues such as how closely a particular retailer should monitor its premises and approaches, what retailers should know about the property's condition at any given time, how vigilant patrons must be for their own safety in various settings, and where customers should be held responsible for looking or not looking are all questions that, in general, must be answered by juries as a matter of fact rather than by judges as a matter of law.

Id. at 445 (emphasis added).

Several material issues of fact remain disputed in this case. As shown below, material questions of fact exist with regard the following, despite Defendants' assertion to the contrary:

(i) Whether or not Defendant Wal-Mart Stores East, L.P. had actual or constructive knowledge of the presence of water on the floor of the aisle where Ms. Wingate slipped and fell and that such water constituted a hazard to its invitees;

(ii) Whether or not Defendant Wal-Mart Stores East, L.P. had in effect a reasonable procedure for inspecting its premises on the day in question for the presence of hazardous conditions, such as water on the floor of a shopping aisle;

(iii) Whether or not Defendant Wal-Mart Stores East, L.P. failed to follow its own inspection procedures at the time in question;

(vi) Whether or not the water on which Plaintiff slipped and injured herself was discoverable by Defendants upon a reasonable inspection.

**1. A Question of Material Fact Exists as to Whether or Not Plaintiff had Equal or Superior Knowledge of the Particular Hazard Which Caused Plaintiff's Injury.**

O.C.G.A. § 51-3-1 states that "[w]here an owner or occupier of land, by express or implied

invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

As stated in American Multi-Cinema, Inc. v. Brown, 285 Ga. 442 (2009), ". . . issues such as how closely a particular retailer should monitor its premises and approaches, what retailers should know about the property's condition at any given time, how vigilant patrons must be for their own safety in various settings, and where customers should be held responsible for looking or not looking are all questions that, in general, must be answered by juries as a matter of fact, rather than by judges as a matter of law." Id. at 445.

With regard to Defendants' contention that Ms. Wingate had superior knowledge of the existence of the subject hazard, there is no evidence in the record that Ms. Wingate had any prior knowledge whatsoever of the presence of water on aisle in the seasonal goods of the store prior to her fall. (Wingate Dep. p. 119 - 120 and 129; Mansell Dep. p. 32 and 35 - 36).

Ms. Wingate had come to the store to shop for Christmas gifts. (Wingate Dep. p. 97). After grabbing a shopping cart, Ms. Wingate began perusing the seasonal goods department which consisted of approximately 4 aisles in the store. Ms. Wingate saw some cookie baskets on the shelves in the middle of one of the aisles approximately 5 feet from where she later fell, and then proceeded to keep shopping and walking with her cart down the various aisles of the seasonal goods department. (Wingate Dep. p. 105, 108 - 110 and 117). Ms. Wingate then doubled back to get one of the cookie baskets and proceeded with her cart back down the aisle with cookie baskets, but this time coming the opposite direction from which she had previously walked down that aisle. (Wingate Dep. p. 108:3-11, 117:20-21 and 119:10-13). As Ms. Wingate was pushing her cart towards where

the cookie baskets were on the shelves she then suddenly slipped on what appeared to be "maybe a cup or two" of water, next to the shelves and approximately five feet from where the cookie baskets were located. (Wingate Dep. p. 117:20-21, 119:10-13 and 130:9 - 131:14; Mansell Dep. p. 38:24 - 39:14).

Although Ms. Wingate testified that she had earlier that day walked with her cart down the aisle where she fell, she had come from the opposite direction in which she was pushing her cart when she fell, and had not noticed any water or other substance on the floor, either during that previous trip or on her return to retrieve a cookie basket. (Wingate Dep. p. 119:10 - 120:1 and 128:25 - 129:25).

Jessica Goff, who had accompanied Ms. Wingate to the store that day and had come Ms. Wingate's assistance within minutes after her fall, testified that the amount of water on the floor where Ms. Wingate had fallen was just slightly larger than an 8-1/2 by 11 inch notepad and that she had to stand over and look straight down at the water on the floor in order to be able to see it. (Goff Dep. p. 38:2 - 39:17 and 69:6-10).

Evidence that the Plaintiff may have previously walked in the general vicinity of the puddle of water on which she slipped does not establish that she had any knowledge of the presence of such water. "'[A]n invitee is not required, as a matter of law, to look continuously . . . for defects . . . since the invitee is entitled to assume the owner/occupier has exercised reasonable care to make the premises safe for the invitee and continues to exercise such care while the invitee remains on the premises."' Perkins v. The Val D'Aosta Company, 305 Ga. App. 126 at 129-130 (2010). "As noted in *Robinson v. Kroger, Co.,* "'[w]hat constitutes a reasonable lookout depends on all the circumstances at the time and place."' 268 Ga. at 742." Nosiri v. Helm, 301 Ga. App. 380, 381

(2009).

As recently stated in Wiggins v. Belk, Inc., 2012 U.S. Dist. LEXIS 5035, Civil Action No. 4:11-CV-88 (S.D. Ga. Sept. 1, 2012):

> To survive a motion for summary judgment, a plaintiff "must come forward with evidence that ... the defendant had actual or constructive knowledge of the hazard." See *Am. Multi-Cinema*, 285 Ga. at 444-45.
>
> > At that point, the burden of production shifts to the defendant to produce evidence that the plaintiff's injury was caused by his or her own voluntary negligence (intentional disregard of a known risk) or causal negligence (failure to exercise ordinary care for one's personal safety). If the defendant succeeds in doing so, the burden of production shifts back to the plaintiff to come forward with evidence that creates a genuine dispute of fact on the question of voluntary or causal negligence by the plaintiff or tends to show that any such negligence resulted from the defendant's own acts or conditions under the defendant's control.
>
> *Id*. at 445.
>
> Furthermore:
>
> > issues such as how closely a particular retailer should monitor its premises and approaches, what retailers should know about the property's condition at any given time, how vigilant patrons must be for their own safety in various settings, and where customers should be held responsible for looking or not looking are all questions that, in general, must be answered by juries as a matter of fact rather than by judges as a matter of law.
>
> *Id*. at 445.
>
> Thus, "summary judgment is granted only when the evidence is plain, palpable, and undisputed." *Robinson v. Kroger Co.*, 268 Ga. 735, 748, 493 S.E.2d 403 (1997).

Id. at 18-20.

Although the water on which Ms. Wingate slipped was visible post-fall when looking straight down at it (Goff Dep. p. 38:2 - 39:17 and 69:6-10), such evidence is not grounds for summary

judgment. "Because one inspecting a '"post-fall scene can observe a hazard from a standing position is not dispositive of whether or not the injured invitee was exercising ordinary care for personal safety before the fall."' Wiggins, supra at 29, citing Robinson v. Kroger Co., 268 Ga. 735 at 743 (1997). See also Ward v. Autry Petroleum Co., 281 Ga. App. 877 (2006), stating:

> [A]n invitee's failure to exercise ordinary care is not established as a matter of law by the invitee's admission that he did not look at the site on which he placed his foot or that he could have seen the hazard had he visually examined the floor before taking the step which led to his downfall. Rather, the issue is whether, taking into account all the circumstances existing at the time and place of the fall, the invitee exercised the prudence the ordinarily careful person would use in a like situation.

Id. at 881-882.

Plaintiff also notes that what Defendants describe on page 14 of their brief as a "*large* puddle of water" was actually described by Ms. Wingate as only "maybe a cup or two" in volume and by Ms. Goff as covering an area just larger than an 8-1/2 by 11 inch notepad. (Wingate Dep. p. 130:9-10; Goff Dep. p. 38:2 - 39:17 and 69:6-10). "[T]he plain view doctrine applies to large objects." Rozy Investments, Inc. v. Bristow, 276 Ga. App. 278, 282 (2005).

**2. A Question of Material Fact Exists as to Whether or Not Defendants Had Constructive Knowledge of the Hazard Which Caused Plaintiff's Fall**.

In contrast to Ms. Wingate's lack of knowledge, however, there is sufficient evidence for a jury to find that Defendants had knowledge of the presence of water on the floor of their seasonal goods aisle and the hazard posed by such water.

Ms. Wingate testified that after she fell and while she was still on the floor several Wal-Mart employees came up to her to offer her assistance. She then heard someone state words to the effect

"That the roof was leaking, and this should have been cleaned up already"[1]. (Wingate Dep. p. 134:23 - 135:1). Although Ms. Wingate could not identify who made that statement, Ms. Goff testified that it was a male wearing a Wal-Mart uniform, who had come to Ms. Wingate's assistance. (Goff Dep. p. 46:10 to 48:10). "I just figured he was a Wal-Mart employee because he had on like a Wal-Mart shirt, you know what I'm saying, a uniform, and he was helping with Crystal." (Goff Dep. p. 48:3-6).

The testimony of Ms. Wingate that someone (whom Ms. Goff identified as wearing a Wal-Mart uniform and providing assistance to Ms. Wingate) stated either to her or someone else in her presence that "the roof was leaking" and the water on which she slipped "should have been cleaned up already" is admissible evidence by which a jury could reasonably find that Defendants' had actual and constructive prior knowledge of the water on the aisle floor which caused Ms. Wingate's fall and subsequent injuries.

Wal-Mart's Assistant Store Manger for the store, Fred Mansell, did acknowledge that he was on duty at the store that day and responded to Ms. Wingate's fall on behalf of Wal-Mart (p. 6, 8 and 42). Mr. Mansell prepared a computerized report for Wal-Mart within 24 hours of Ms. Wingate's fall as part of standard Wal-Mart procedure. (Mansell Dep. p. 6:18 - 8:10 and 42:7-13). Mr.

---

1

1. Under F.R.E. 803(1) and 803(2) such statement is not excluded by the rule against hearsay as it was both "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" and "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused". There is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance. Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself. There is no hard time limit that must be met under Rule 803; what is relevant is whether the declarant is still under the excitement of the startling event. U.S. v. Smith, 606 F.3d 1270, 1279 (10th Cir. 2010).

Mansell, however, testified that his recollection of this incident was essentially limited to just what was in his brief report. (Mansell Dep. p. 6:10-23 and 9:3 - 13:14). He did, however, testify that he noted in his report that there was water on the floor where he found Ms. Wingate fell, but that he did not recall or record in his report where the water had come from. (Mansell Dep. p. 14:20 - 16:9).

Q. Okay. Did you undertake any type of investigation to find out or figure out where the water had come from?

A. I didn't record that. It's normal procedure for us to look for an immediate source if there is an issue. I would -- I can't recollect exactly what I did or my findings in that. I didn't record it in the report.

I would always do that. You know, anytime I report to a scene if there is a hazard, I try to make a quick determination of where it came from. There's not really any extensive, you know, research that you would do that would be specific, you know, for every incident.

Most times if there is something there it's apparent and you can identify it. In this case I didn't record that, and I do not recollect that I found the source of that.

Q. Okay. But you just don't know one way or the other?

A. I don't.

(Mansell Dep. p. 13:25 - 14:20).

As a result, there is sufficient evidence in the record for a jury to find that Defendant Wal-Mart Stores East, L.P. had both actual and constructive knowledge of water which caused Ms. Wingate's fall.

Plaintiff also notes that Mr. Mansell also testified that according to his report six photographs were taken of the scene by either himself or another Wal-Mart employee as part of standard store policy. (Mansell Dep. p. 16:10 - 17:23 and 38:21-23). According to store policy, copies of such photographs were supposed to be sent to the home office and kept in the accident folder for the particular incident. (Holston Dep. p. 33:3-21 and 35:6 - 36:7). Wal-Mart, however, in its Responses to Plaintiff's First Interrogatories and First Request for Production of Documents to Defendants, has denied that it has custody of any such photographs and subsequently represented that it is now unable to locate any such photographs despite Plaintiff's request for the same in paragraphs 7, 8 and 9 of in Plaintiff's First Interrogatories and First Request for Production of Documents to Defendants. (Holston Dep. p. 35:6-14; Defendants' Responses to Plaintiff's First Interrogatories and First Request for Production of Documents to Defendants, par. 7, 8 and 9).

**3. <u>Wal-Mart Has Failed to Show That it Had a Reasonable Inspection Procedure And That it Followed Such Procedure</u>.**

Wal-Mart "was under a duty to inspect for dangerous conditions existing on the premises." <u>Valentin v. Six Flags Over Ga., L.P.</u>, 286 Ga. App. 508, 509 (2007). An "owner/occupier owes person invited to enter the premises a duty of ordinary care to have the premises in a reasonably safe condition and not to expose the invitees to unreasonable risk or to lead them into a dangerous trap." <u>Robinson v. Kroger Co.</u>, 268 Ga. 735, 740 (1997). "This includes inspecting the premises to discover possible dangerous conditions of which the owner/occupier does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises." <u>Id</u>. at 740. "Where reasonable minds can differ as to the conclusion to be reached with regard to questions of whether an owner/occupier breached the duty

of care to invitees and whether an invitee exercised reasonable care for personal safety, summary adjudication is not appropriate." Id. at 740. "A proprietor's failure to discover the defect through the exercise of reasonable care in inspecting the premises gives rise to constructive knowledge where the owner or occupier had an opportunity to discover the dangerous condition and to remedy it." Valentin, supra at 509, citing Quarles v. Georgia Service Systems, 263 Ga. App. 563, 564 (2003).

In the present case, Defendants have failed to present timely and credible evidence that they followed a reasonable inspection procedure on the date of the subject incident. "The evidence must establish an adherence to customary inspection procedures on the day in question and not simply that such procedures exist." Valentin, supra at 511, citing Quarles, supra at 263 Ga. App. 565. See also Kauffman v. Eastern Food & Gas, Inc., 246 Ga. App. 103, 105 (2000).

Wal-Mart's Assistant Manager for the subject store, Fred Mansell, testified that the store's procedure for making sure its shopping aisles were free of hazards was a safety and zone sweep of the store performed at the top of every hour, give or take five minutes. (Mansell Dep. p. 24 and 54; Holston Dep. p. 18). Safety sweeps and zone defense are done at the same time. "There's not really a difference" between them. (Mansell Dep. p. 23:5-13). Essentially, "every associate would go to their area of responsibility . . . and just take a quick tour of the area." (Mansell Dep. 22:20-25). The associates would tour their area, identify any issues with the shopability of the side counters and look for safety, pricing and in-stock issues. (Mansell Dep. p. 23:16-20).

When Mr. Mansell was asked, however, whether or not a safety sweep had actually occurred prior to Ms. Wingate's fall, he answered:

Q. I mean, is there any way to look back for that particular date and determine whether or not a zone defense or safety sweep was done of that particular

aisle where Ms. Wingate fell?

MR. DECUSATI: Are you asking for something in writing, Steve, other than what his personal knowledge might be?

MR. SUNA: I'm just asking either way.

A. I'm not aware of any record that we would have of it.

Q. (By Mr. Suna) Okay. I mean, do you know whether, in fact, a safety sweep or zone defense was done of that aisle in the hour prior to when Ms. Wingate fell?

A. I would not.

Q. Do you know anyone who would?

A. I wouldn't.

Q. And I think you said there's no written log, I guess, documenting those sweeps?

A. There's not.

(Mansell Dep. p. 26:21 - 27:15).

When later questioned by Wal-Mart's counsel, Mr. Mansell further testified that:

Q. Let's talk a little bit about that day. As a member of management of the store on the day of the plaintiff's fall, one of your responsibilities would have been to ensure that safety sweeps and zone defenses were being carried out?

A. That's correct.

Q. And did you carry those duties out that day?

A. I did.

. . .

Q. And you mentioned earlier that the safety sweeps are called out at the top of the hour?

A. That's correct.

Q. All right. So then generally they're done -- if it's like -- would be like right around nine o'clock, then right around ten o'clock, give or take a few minutes, and around 11:00 o'clock?

A. That's correct.

Q. And were they being called out that day?

A. I don't recall.

Q. You don't recall specifically whether or not they were?

A. I don't recall hearing a call that day.

. . .

Q. (By Mr. DeCusati) Would that be an unusual circumstance; in other words, if they didn't call one? Generally are they called when you're working?

A. During -- up to 2010, they were called regularly. If they were not called, then as a member of management I would be responsible for ensuring that safety sweeps were conducted and that the calling started back on schedule if there was a lapse for some reason.

Q. Do you have any knowledge as to whether or not there were any unusual circumstances on this particular day that safety sweeps were not being called out?

A. I don't recall.

(Mansell Dep. 59:7 - 61:13).

In addition to the store's Assistant Manager, Fred Mansell, Plaintiff also deposed the one of the store's three Shift Manager's, Thomas Holston. The store was in between Store Managers at the time of Ms. Wingate's fall and, as a result, overall management of the store was divided between its three Shift Managers, Mr. Holston, Derrick Trawick and Rebecca Malott. (Holston Dep. p. 7 - 8 and 10 - 11). Mr. Holston testified that it would not be possible to determine who was actually working at the store day. (Holston Dep. p. 12:6-16). When Mr. Holston was asked whether or not there was any way to verify whether or not a safety sweep had actually occurred that day, he answered:

Q. Okay. Would there be any way -- I mean, were they documented at all?

A. No.· They were just --

Q. Just something that would get done?

A. Just something that we just say over the loud speaker, PA.

Q. Okay. Was there any way to go back and verify whether or not one had occurred?

A. No.

Q. Or had not occurred?

A. No.

Q.· · Okay.· It was just something that wasn't tracked?

A. No.

Q. Is that correct?

A. Yes.

Q. Am I correct?

A. Yes.

MR. DECUSATI: In the paperwork it wasn't tracked.

THE WITNESS: Paperwork it wasn't tracked.

Q. (By Mr. Suna)· Was it tracked any other way?

A. No.

. . .

Q. (By Mr. Suna) How would -- what steps would you take to verify whether or not a safety sweep or zone defense had been done for a particular aisle back in December of 2010?

A. I guess we couldn't -- we couldn't verify each aisle, each area. We would just call for the safety sweeps, and the associate in the area would check it.

Q. Okay. But if the associate for some reason didn't, you wouldn't know one way or the other?

A. Well, a lot of times we did communicate with each associate --

Q. Okay.

A. -- on each given shift what the areas and responsibilities were.

Q. But with regards to the date and area where Ms. Wingate was injured, do you have any knowledge one way or the other as to whether or not a safety sweep or zone defense had actually been done on the aisle where she was injured?

A. No.

Q. Okay. Would anybody know that?

A. I don't know.

(Holston Dep. p. 18:6 - 20:15).

Defendants have filed an affidavit of a Christine Harris concurrent with and as Exhibit J to and their Motion for Summary Judgment. Ms. Harris avers in her affidavit that she was a Customer Service Manager working in the front of the store at the time of Ms. Wingate's fall. Plaintiff shows, however, that Ms. Harris had not been identified by Defendants in their Responses to Plaintiff's First Interrogatories and First Request for Production of Documents to Defendants or in Defendants' Responses to Initial Disclosures prior to the filing of their motion as someone having any knowledge of the subject incident or working in the store at the time of the subject incident. Nor was Ms. Harris identified by either Mr. Mansell or Mr. Holston as someone working at the store at that time, despite their identification of several different individual managers who might have working in the store that day. (Holston Dep. p. 11:8 - 12:16 and 15:19 - 17:25; Mansell Dep. p. 21:7-9).

Significantly, in paragraph 1 of Defendants' Responses to to Plaintiff's First Interrogatories and Request for Production of Documents to Defendants the sole person identified in response to Plaintiff's 1st interrogatory requesting the name of any and all persons who are believed or known by you, your agents or attorneys to have personal knowledge concerning the happenings of the incident described in Plaintiff's complaint, was Frederick Mansell.

In paragraph 6 of Defendants' Responses to to Plaintiff's First Interrogatories and Request for Production of Documents to Defendants, the sole person identified in response to Plaintiff's 6th interrogatory requesting the name and title/job description of each Defendants' employees at the subject store on December 12, 2010 between 8:00 a.m. and 10:30 a.m., was, again, Frederick Mansell.

Defendants also state in paragraph 25 of Defendants' Responses to to Plaintiff's First Interrogatories and Request for Production of Documents to Defendants that "they do not have logs or records of its '"safety sweeps"' or '"zone defense"'.

The first time that Ms. Harris was identified by Defendants as someone working in the subject store at the time of Ms. Wingate's fall or having knowledge of this incident was in paragraph 6 of Defendants' First Supplemental Responses to Plaintiff's First Interrogatories and Request for Production of Documents to Defendants which were served **on May 16, 2013**, two days **after** the filing of Defendants' Motion for Summary Judgment.

In any event, the time listed in Mr. Mansell's report for Ms. Wingate's fall is 9:45 a.m. (Mansell Dep. p. 40:11-13). According to Ms. Harris, the last prior safety sweep would have been conducted at 9:00 a.m., approximately 45 minutes prior to Ms. Wingate's fall. In a recent Wal-Mart case, Funez v. Wal-Mart Stores East, L.P., 2013 LEXIS 3196, Civil Action No. 1:12-CV-0259-WSD (N.D. Ga. 2013), the court held that "[w]hether an inspection procedure is reasonable thus depends on the proximity of an inspection to an event causing an injury" and "[f]or that time to reasonable as a matter of law, there must be '"plain, palpable, and undisputed"' evidence that an inspection was conducted within a '"brief period of time"' prior to a plaintiff's fall sufficient to justify granting summary judgment to a defendant.' Id. at 14 - 15. The court in Funez, supra, went on to state that a safety sweep conducted within 2 hours of the plaintiff's fall "did not occur within the thirty-minute period Georgia courts have considered reasonable as a matter of law." Id. at 15.

In addition, Ms. Harris does not state in her affidavit that she was the person who carried out the safety sweep that morning, much less identify who exactly did, allegedly, perform such sweep. Nor does Ms. Harris state that she was actually in the area where Ms. Wingate fell during any of the

previous safety sweeps that morning. Instead, all Ms. Harris affidavit provides is a general conclusionary statement that Wal-Mart's safety sweep procedures were "in place" and "properly carried" out on the day and in the area of Ms. Wingate's fall.

There is also no evidence that Ms. Harris was one of the Wal-Mart employees who responded to Ms. Wingate's fall and Ms. Harris does not claim in her affidavit to have any personal knowledge regarding the condition of the floor where Ms. Wingate fell at the time of such fall or the specific location where Ms. Wingate fell. Accordingly, as was the case in Funez, supra, Ms. Harris' affidavit does not show that the specific area where Ms. Wingate fell was inspected as part of the 9:00 a.m. safety sweep and does not provide sufficient evidence regarding inspections of the location where Ms. Wingate fell to support summary judgment. See Funuz, supra, footnote 3 at 16.

At most, all that Ms. Harris' affidavit establishes is that a call for safety and zone defense sweeps was made on the PA system at 9:00 a.m. that morning and that employees were then, according to store procedure, supposed to do a tour their particular areas of the store, but not that any specific person did actually undertake an inspection of the specific location where Ms. Wingate fell. As confirmed by Mr. Holston and Mr. Mansell, Defendants have no documentation of any safety sweeps that morning and no way to determine whether or not a sweep was performed on a particular aisle. (Holston Dep. p. 18:12 - 20:15; Mansell Dep. p. 26:21 - 27:15).

Based on the contradictions between the testimony given by the store's Assistant Manager and Shift Manager, Fred Mansell and Thomas Holston, and the affidavit from Defendants' newly identified witness, Christine Harris, the evidence presented by Defendants in this case is not "plain, palpable and undisputed" that Defendants actually followed their own inspection procedure that day in the specific location where Ms. Wingate fell or that the timing of such procedure was reasonable

as a matter of law.

When the nature of a business is likely to produce a hazard, frequent inspections may be necessary, and the reasonableness of an inspection program is a question to be decided by the jury. Benefield v. Tominich, 308 Ga. App. 605, 609 (2011). The length of time a hazard must exist before the owner should have discovered it and what constitutes a reasonable inspection procedure vary with each case, depending on the nature of the business, the size of the store, the number of customers, the nature of the dangerous condition, and the store's location. Id. at 610.

**4. Defendant Wal-Mart Stores East, L.P. is a Proper Party to This Action.**

Although, as show in part 2 above there is evidence that the water which caused Plaintiff's fall had leaked from the roof or ceiling above, Plaintiff does not contest that Defendants BC Investments - Augusta, LLC, Wal-Mart Stores, Inc. and Wal-Mart Stores East, Inc. are entitled to summary judgment as BC Investments - Augusta, LLC was an out of possession owner and Wal-Mart Stores, Inc. and Wal-Mart Stores East, Inc. were not, based upon Defendants' representations, the owners, occupiers or operators of the subject store at the time of Ms. Wingate's injury, unlike Defendant Wal-Mart Stores East, L.P.

## III. CONCLUSION

For the reasons set forth above, Defendants Wal-Mart Stores East, L.P. has failed to establish that it is entitled to summary judgment and, as a result, Plaintiff respectively requests that such Defendant's motion be denied in its entirety.

Plaintiff does consent to summary judgment solely as to Defendants BC Investments - Augusta, LLC, Wal-Mart Stores, Inc. and Wal-Mart Stores East, Inc. only.

Respectfully submitted,

DAVIS, ZIPPERMAN KIRSCHENBAUM
& LOTITO, LLP

By: /S/ Steven A. Suna

Steven A. Suna
Georgia Bar No. 692349
Attorney for Plaintiff

918 Ponce de Leon Avenue, N.E.
Atlanta, Georgia 30306
(404) 688-2000 - phone
(404) 872-1622 - fax
ssuna@dzkl.com

## CERTIFICATE OF SERVICE

**THIS IS TO CERTIFY** that I have this date served opposing counsel of record with a copy of the foregoing pleading with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to attorneys of record and by depositing a copy of same in the United States Mail with sufficient postage affixed thereto and properly addressed as follows:

Albert J. DeCusati
MCLAIN & MERRITT
3445 Peachtree Road, N.E., Suite 500
Atlanta, Georgia 30326

THIS 7th DAY OF JUNE, 2013.

By: /s/ Steven A. Suna
STEVEN A. SUNA
Attorney for Plaintiff